Bahadori & Thomas, LLP
Bryan M. Thomas
(State Bar No. 238409)
2 Park Plaza, Suite 450
Irvine, CA 92614
Oakland, CA 94607
Telephone: (949) 954-8164
Facsimile:  (949) 954-8163
bmt@bahadorilaw.com

Attorneys for Plaintiffs the Infirmary, LLC
And Davenport's Family Restaurant, Inc.

[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE INFIRMARY, LLC, | ) |
| and | ) |
| DAVENPORT'S FAMILY RESTAURANT, INC. | ) CASE NO: |
| | ) COMPLAINT |
| Plaintiffs, | ) |
| vs. | ) **JURY TRIAL DEMANDED** |
| NATIONAL FOOTBALL LEAGUE, INC.; NFL ENTERPRISES, LLC; DIRECTV HOLDINGS, LLC; | ) |
| Defendants, | ) |

## CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

COME NOW, Plaintiffs The Infirmary  LLC ("The Infirmary") and Davenport's Family

Restaurant, Inc. ("Davenport's")(collectively, "Plaintiffs") on  behalf  of  themselves  and  all

others similarly situated, by and through their undersigned counsel, and submit this Complaint

- 1 -

("Complaint") against Defendants National Football League, Inc., ("NFL") NFL Enterprises, LLC ("NFL Enterprises"), DirecTV, LLC, ("DirecTV") and DirecTV Holdings, LLC ("Defendants").

## NATURE OF THE ACTION

1.      On December 28, 1958, 45 million Americans tuned into NBC to watch the Baltimore Colts play the New York Giants in the NFL Championship Game. The Colts, led by Johnny Unitas, defeated the Giants 23-17 in sudden death overtime. Known as the "Greatest Game Ever Played," the 1958 NFL Championship is widely credited with popularizing televised professional football games. NBC paid $100,000 for the Championship broadcast rights.

2.      Over the next four decades, the value of televised broadcasts of NFL games increased exponentially. By 1990, the NFL's combined contracts with ABC, CBS, ESPN, NBC, and TNT earned the league some $900 million per year.

3.      In 1994, the NFL reached an agreement with DirecTV to broadcast NFL Sunday Ticket ("Sunday Ticket"), an out-of-market broadcast package. Out-of-market games are games being played outside a team's given territory.  For instance, in Atlanta, an Oakland Raiders game against the Seattle Seahawks would be considered an out-of-market game, because it involves teams not considered part of the Atlanta sports market. However, in the geographic region surrounding Atlanta, the Falcons game would not be carried on NFL Sunday Ticket; rather it would be carried locally.

4.      During the average NFL week, Sunday Ticket broadcasts all games except for the NFL's Thursday Night Football, Sunday Night Football, and Monday Night football games.

5.      Since 1994, DirecTV has had an exclusive right to distribute out-of-market games.

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

6.     Fans of NFL teams are fiercely loyal. A Green Bay Packers fan living in Minneapolis would not consider the local Minnesota Vikings telecast to be an acceptable substitute to watching the Packers.

7.     Many bars and restaurants cater to these displaced fans. For instance, on Sunday afternoons in New York City, 49ers fans flock to Finnerty's on Second Avenue. The Kettle of Fish bar in the West Village boasts that "[w]ith the exception of Lambeau Field, the Kettle of Fish is the best place to watch a Packers game." Similarly, Raider Nation packs into Peter Dillon's on 40th Street. Plaintiff The Infirmary, a New Orleans themed bar/restaurant, caters to fans of the New Orleans Saints. The only way establishments like these can access their patrons' preferred games is through Sunday Ticket.

8.     Other establishments show a wide slew of games. Charlie Brown's Neighborhood Bar and Grill in San Antonio, voted the best sports bar in Bexar County, caters to sports fans generally. For bars like Charlie Brown's, Sunday Ticket is a must, and fans of only one team, many teams, or football generally, gather to watch numerous Sunday games. Like these types of bars Plaintiff Davenport's caters to sports fans generally, as well as to those who want to watch their specific teams play.

9.     The NFL and DirecTV market Sunday Ticket to bars and restaurants through phrases like "Turn your business into the neighborhood's go-to spot with the undisputed leader in sports" and "[o]nly DirecTV has the sports package to attract fans of every stripe with NFL SUNDAY TICKET 2015…."

10.     Sunday Ticket is expensive. The least expensive Sunday Ticket commercial package increased 11.5% this year. The least expensive commercial Sunday Ticket package is $1,458 per season, while DirecTV charges some larger sports bars in excess of $120,000. These

1    prices are determined by the fire code occupancy of the establishment. The only reason that

2    DirecTV is able to secure such high prices is because of violations of the antitrust laws.

3         11.    Sunday Ticket is the product of a collusive arrangement by the NFL teams.

4    Every team owns the initial rights to the broadcast of the team's games. Each of those teams has

5    colluded with each other, and granted the NFL the exclusive right to market games outside of

6    each team's home market. Absent the collusion and DirecTV's connivance, each team would

7    compete against each other in the market for NFL football programming.

8

9         12.    Based on DirecTV's attempts to purchase exclusive rights to Major League

10   Baseball's ("MLB") out-of-market sports package, MLB Extra Innings ("Extra Innings"), it can

11   be estimated that the NFL received 43% more in consideration for selling exclusive access to

12   out-of-market football game packages than it would have absent the exclusive agreement. The

13   increased cost is then passed along to consumers.

14

15        13.    Further, because Sunday Ticket is available exclusively on DirecTV, DirecTV is

16   able to, and does, sell Sunday Ticket at a price far higher than it and the NFL would receive

17   absent the anticompetitive conduct. DirecTV charges its customers far less for out-of-market

18   sports packages for which it does not have exclusive access. Extra Innings, is available for

19   roughly a third of the price of Sunday Ticket, despite broadcasting hundreds more games per

20   season. Similar packages from the National Hockey League, known as Center Ice, and the

21   National Basketball Association, known as League Pass, are similarly a fraction of the price of

22   Sunday Ticket.

23

24        14.    Competition for the broadcast of out-of-market NFL games has been eliminated.

25   But for the exclusive contract between DirecTV and the NFL teams, additional Multichannel

26   Video Programming Distributors ("MVPDs"), such as Comcast or Time Warner Cable, would

27   be willing to compete with DirecTV for consumers of these games. In Canada, where DirecTV

28

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

does not have an exclusive contract, Sunday Ticket is offered by a plethora of MVPDs. But for the exclusive contract, MVPDs such as Comcast and Time Warner Cable would bid to host Sunday Ticket; indeed, they attempted to do so in 2002. In turn, prices charged to consumers would be much lower.

15.     Further, but for the collusive pooling agreement entered into by the NFL teams, and protected by the exclusive DirecTV contract, the individual teams would compete against each other in the market and drive down the price of out-of-market games.

## PARTIES

16.     Plaintiff The Infirmary is a restaurant/bar located in New York City. The Infirmary purchased Sunday Ticket from DirecTV to attract customers on Sunday afternoons during the NFL's regular season.

17.     Plaintiff Davenport's is a restaurant/bar located in Cumberland, Rhode Island. Davenport's purchased Sunday Ticket from DirecTV to attract customers on Sunday afternoons during the NFL's regular season.

18.      Defendant National Football League Inc. is the formal incorporation of the 32 professional football teams. Until recently, the NFL was a trade association made up of the 32 teams playing in the National Football League, organized as a tax-exempt non-profit under § 501(c)(6) of the Internal Revenue Code. Defendant National Football League, Inc.'s principal place of business is New York, New York.

19.     Defendant NFL Enterprises, LLC, was organized to hold the 32 teams' broadcast rights and to license them to MVPDs and local broadcasters, including Defendant DirecTV. Defendant NFL Enterprises, LLC's principal place of business is New York, New York. The 32 NFL Teams are comprised of:

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1      a.      Arizona Cardinals, Inc. is an Arizona corporation, and owns and operates the
2  Arizona Cardinals.

3      b.      Atlanta Falcons Football Club LLC is a Georgia limited liability company, and
4  owns and operates the Atlanta Falcons.

5      c.      Baltimore Ravens Limited Partnership is a Maryland limited partnership, and
6  owns and operates the Baltimore Ravens.

7      d.      Buffalo Bills Holdings, Inc. is a New York corporation, and owns and operates
8  
9  the Buffalo Bills.

10      e.      Panthers Football LLC is a North Carolina limited liability company, and owns
11  and operates the Carolina Panthers.

12      f.      Chicago Bears Football Club, Inc. is a Delaware corporation, and owns and
13  operates the Chicago Bears.
14  

15      g.      Cincinnati Bengals, Inc. is an Ohio corporation, and owns and operates the
16  Cincinnati Bengals.

17      h.      Cleveland Browns LLC is a Delaware limited liability company, and owns and
18  operates the Cleveland Browns.

19      i.      Dallas Cowboys Football Club, Ltd. is a Texas limited partnership, and owns
20  
21  and operates the Dallas Cowboys.

22      j.      Denver Broncos Football Club is a Colorado corporation, and owns and operates
23  the Denver Broncos.

24      k.      Detroit Lions, Inc. is a Michigan corporation, and owns and operates the Detroit
25  Lions.

26      l.      Green Bay Packers, Inc. is a Wisconsin corporation, and owns and operates the
27  Green Bay Packers.
28  

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1     m.     Houston NFL Holdings LP is a Delaware limited partnership, and owns and

2 operates the Houston Texans.

3     n.     Indianapolis Colts, Inc. is a Delaware corporation, and owns and operates the

4 Indianapolis Colts.

5

6     o.     Jacksonville Jaguars Ltd. is a Florida limited partnership, and owns and operates

7 the Jacksonville Jaguars.

8     p.     Kansas City Chiefs Football Club, Inc. is a Texas corporation, and owns and

9 operates the Kansas City Chiefs.

10     q.     Miami Dolphins, Ltd. is a Florida limited partnership, and owns and operates the

11 Miami Dolphins.

12     r.     Minnesota Vikings Football Club LLC is a Minnesota limited liability company,

13 and owns and operates the Minnesota Vikings.

14

15     s.     New England Patriots, LP is a Delaware limited partnership, and owns and

16 operates the New England Patriots.

17     t.     New Orleans Louisiana Saints LLC is a Texas limited liability company, and

18 owns and operates the New Orleans Saints.

19     u.     New York Football Giants, Inc. is a New York corporation, and owns and

20 operates the New York Giants.

21

22     v.     New York Jets Football Club, Inc. is a Delaware corporation, and owns and

23 operates the New York Giants.

24     w.     Oakland Raiders LP is a California limited partnership, and owns and operates

25 the Oakland Raiders.

26     x.     Philadelphia Eagles Football Club, Inc. is a Delaware corporation, and owns and

27 operates the Philadelphia Eagles.

28

1    y.    Pittsburgh Steelers Sports, Inc. is a Pennsylvania corporation, and owns and
2  operates the Pittsburgh Steelers.

3    z.    San Diego Chargers Football Co. is a California corporation, and owns and
4  operates the San Diego Chargers.

5
6    aa.    San Francisco Forty Niners Ltd. is a California limited partnership, and owns
7  and operates the San Francisco 49ers.

8    bb.    Football Northwest LLC is a Washington limited liability company, and owns
9  and operates the Seattle Seahawks.

10    cc.    The Rams Football Company LLC is a Delaware limited liability company, and
11  owns and operates the St. Louis Rams.

12    dd.    Buccaneers Limited Partnership is a Delaware limited partnership, and owns and
13  operates the Tampa Bay Buccaneers.
14

15    ee.    Tennessee Football, Inc. is a Delaware corporation, and owns and operates the
16  Tennessee Titans.

17    ff.    Washington Football, Inc. is a Maryland corporation, and owns and operates the
18  Washington Redskins.

19    20.    The entities identified in ¶¶ 18(a) - 18 (ff) are collectively referred to herein as
20  the "NFL Teams."
21

22    21.    Defendant DirecTV Holdings, LLC is a Delaware Limited Liability Company
23  and has its principal place of business at 2230 East Imperial Highway, El Segundo, California.

24  Defendant DirecTV Holdings, LLC works as the operating arm of DirecTV, Inc. (now part of

25  AT&T, Inc.), and touts itself as "a leading provider of digital television entertainment in the

26  United States."

27

28

- 8 -

22.     DirecTV, LLC, is a California Limited Liability Company that has its principal place of business at 2230 East Imperial Highway, El Segundo, California. Defendant DirecTV, LLC, issues bills and processes payments to DirecTV's commercial subscribers, such as Plaintiffs herein.

## JURISDICTION AND VENUE

23.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against the Defendants herein for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

24.     Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391. Further, members of the putative class were injured in this District, and two of the Defendants have their principal places of business in this District.

## TRADE AND COMMERCE

25.     The Defendants herein are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. The NFL teams play exhibitions of football throughout the United States, each of the teams broadcast their games throughout the United States and market products throughout the United States.

**CLASS ACTION ALLEGATIONS**

26.     Plaintiffs bring this action on their own behalf, and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Class") defined as:

> All DirecTV commercial subscribers in the United States who, persons or from September 1, 2011 until the effects of the anticompetitive conduct described herein have ceased (the "Class Period"), who purchased NFL Sunday Ticket from DirecTV or its subsidiaries.

27.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are thousands of Class members, the exact number and identities of which can be obtained from Defendants.

28.     There are questions of law or fact common to the Class, including but not limited to:

a.      Whether Defendants have engaged in, and continue to engage in a contract, combination, or conspiracy between themselves to fix, raise, maintain, or stabilize prices of Sunday Ticket, by preventing any of DirecTV's competitors from offering Sunday Ticket;

b.      Whether, and the extent to which, the price for Sunday Ticket charged to the class members has been artificially inflated as a result of the collusion of the NFL Teams with each other, and with DirecTV;

c.      Whether, and the extent to which, Sunday Ticket constitutes an illegal tying agreement in restraint of trade;

d.      The identities of the participants in the conspiracy;

e.      The conspiracy's duration, and the acts performed by Defendants in furtherance of the conspiracy;

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

f.      Whether the conduct at issue violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.      Whether the conduct at issue violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

h.      Whether Plaintiffs and the putative class were injured by the conduct at issue; and, if so, the appropriate measure of damages.

29.      The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

30.      Plaintiffs are members of the Class; Plaintiff's claims are typical of the claims of the members of the Class; Plaintiffs will fairly and adequately protect the interests of the members of the Class; and Plaintiffs' interests are coincident with and not antagonistic to other members of the Class. In addition, Plaintiffs have retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

31.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for the NFL Teams and DirecTV.

32.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which the Defendants have records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

### Early History of NFL Broadcasting

33.     The growth of television and professional football's rise to popularity occurred simultaneously. Each team was originally free to negotiate its television rights locally, but concerned about over-competition, in 1951 the NFL teams each agreed to a by-law in the league's charter. With some exceptions, this by-law gave each team exclusive broadcasting rights to a geographic area 75 miles around their stadium. This meant that the New York Yanks football team could not broadcast its games into the Chicago Cardinals territory, and *vice-versa*.

34.     The 1950s featured dynamic games between football powerhouses such as the Detroit Lions and Cleveland Browns. The DuMont Network paid the NFL $75,000 for the broadcast rights to the NFL Championship games of the early 1950s. By 1955, CBS had taken over the broadcasts, paying the NFL $100,000, and had also begun broadcasting a handful of regular season games.

35.     By 1961, the NFL had reached an agreement with CBS that the network would broadcast all teams' games into their local television markets, which by 1964 earned the league $14.1 million. The upstart American Football League ("AFL") had a similar arrangement with ABC, earning the AFL $36 million in 1965.

36.     In 1961, the United States Congress passed the Sports Broadcasting Act ("SBA") to regulate the sales of sports games' broadcast rights. 15 U.S.C. §§ 1291, *et seq*. As described more fully below, the SBA provided for limited antitrust immunity to the NFL teams for their

pooled rights contracts, i.e., over-the-air broadcast rights contracts given to the broadcast networks.

37.     In 1966, the NFL and AFL announced they would merge into a single league, today's NFL. The combined entity pioneered a new concept, a single nationwide game on Monday nights, which proved exceedingly popular.

**Out-of-Market Games**

38.     By 2011, when the NFL entered into its newest contracts with ESPN, CBS, Fox, and NBC, the value of television rights to NFL games had increased to billions of dollars. According to a Forbes article, on December 14, 2011, the NFL announced:

> [N]ine-year extensions to its broadcast television packages with Fox, NBC and CBS under which the networks are expected to pay roughly 60% more. The new agreements will run through the 2022 season as the current deals expire after the 2013 season. Each network gets the rights to three Super Bowls and NBC maintains its flexible schedule on Sunday nights during the second half of the season. NBC will also add the Thanksgiving primetime game starting in 2014. Financial terms have not been released, but the three networks are expected to pay roughly $3 billion a year on average annually compared to the current $1.93 billion they collectively pay. ESPN re-upped its deal with the NFL earlier this year at an annual rate of $1.9 billion.

39.     During the regular NFL season, there are single, nationally telecasted games on Thursday, Sunday, and Monday nights. Three games are also broadcast on local television stations on Sunday during the day. One network (which one depends on the week and the schedule), broadcasts a 1:00 p.m. EST early game, and a 4:25 p.m. EST late game, while another network broadcasts either the 1:00 p.m. EST early game, or the 4:25 p.m. EST late game. Usually, at least one of these games is a game featuring the local team.[1]

---

[1] There are some exceptions. First, if the game is not sold out, it will not be carried on network television. Second, for areas with two local teams (New York City, and Oakland/San Francisco Bay Area), both "local teams" will have their games shown. Third, in the event the local team has a bye week, none of the three games will feature a local team.

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

40.     This scheduling leads to a substantial slate of Sunday afternoon games which are broadcast on local television stations, but which are not carried nationally. For instance, the broadcast of 2014's Week 7 matchup between the Arizona Cardinals and Oakland Raiders was only carried in the Cardinals' and Raiders' markets, and was not carried outside of their markets. There are up to ten of these out-of-market games per week.[2]

**The NFL, DirecTV, and Sunday Ticket**

41.     The NFL Teams have pooled and packaged these out-of-market sports broadcasts, through NFL Enterprises, LLC, into a package called Sunday Ticket. Sunday Ticket is attractive to bars and restaurants, such as Plaintiffs herein, because Sunday Ticket appeals to fans who live outside the market for their favorite team, fans who play fantasy football, and fans that simply enjoy watching football. Simply put, if a bar or restaurant wants to draw a crowd on Sunday afternoons, Sunday Ticket is a must-have package.

42.     Sunday Ticket debuted in 1994 on DirecTV. The NFL Teams have regularly renewed their exclusive access contract with DirecTV since 1994.

43.     In 2002, DirecTV and the NFL Teams reached a five year contract, for approximately $400 million per year to the NFL Teams for Sunday Ticket. The NFL teams rejected an offer from a consortium of cable companies that offered $400 million to $500 million annually for nonexclusive rights to carry the package.

44.     By 2009, under an even more lucrative contract, DirecTV was paying the NFL $1 billion per year.

---

[2] The identity of the ten games varies, of course, by the location of the viewer.

45.     DirecTV reached its latest agreement with the NFL in October 2014. According to news reports, DirecTV will pay the NFL Teams $1.5 billion per year for eight years in return for the exclusive rights to broadcast NFL games.

46.     Sunday Ticket is incredibly valuable to DirecTV. During the run-up to the 2011 season, the NFL Players Association threatened a labor strike. Although CBS, ESPN, Fox Broadcasting, and NBC would pay nothing if no games were played, DirecTV agreed to pay $1 billion to the NFL even if it received no games per year, simply so that DirecTV could keep its exclusive access.

47.     In May 2014, AT&T announced that it had agreed to purchase DirecTV for $50 billion. The transaction was conditional on DirecTV's renewal of its exclusive distribution agreement with the NFL Teams. Upon information and belief, the transaction has not yet closed.

48.     Through Sunday Ticket, the NFL teams offer DirecTV subscribers access to the Sunday afternoon games that are not otherwise available in their market via the national telecasts. For commercial users such as Plaintiff, this access is conditioned on two factors: first, the Sunday Ticket subscribers must also have DirecTV's regular pay television service; second, the customer must take the whole slew of Sunday Ticket games, not only those teams' games preferred by the customer.

49.     Defendants have colluded to sell out-of-market games only through DirecTV, eliminating competition in the distribution of out-of-market games. The arrangement by NFL Teams has eliminated competition amongst themselves, *viz.* a customer cannot choose only to watch the games of the Kansas City Chiefs. Further, by marketing their monopoly product only through DirecTV, Defendants have conspired to eliminate competition in the distribution of out-

of-market games and to require the purchase of Sunday Ticket from DirecTV at supra-competitive prices.

**Defendants' Supra-Competitive Pricing of Sunday Ticket**

50.     Each of the four major American sports associations (NFL, NBA, MLB and NHL) offers an out-of-market sports package, and has since approximately 2005. The prices of the baseball, basketball, and hockey packages are approximately $200 per season, and have remained relatively constant since 2005. Each of these packages is available across MVPDs, as well as over the internet, or on a data and video equipped smartphone. In addition, the NBA and NHL allow their customers to purchase a smaller package if they so desire, giving them access to a customer-selected subset of teams at a less expensive price.

51.     In comparison, despite being available on only a single MVPD platform, having limited access to broadband, and showing drastically fewer games than the other three major sports' out-of-market packages, and showing those games on only one day of the week, Sunday Ticket has always been more expensive than any of the other out-of-market packages.

52.     Further, while the other out-of-market packages have had only small increases in price, Sunday Ticket increased in price by nearly one third between 2005 and 2010. In 2015, DirecTV will charge its commercial customers a double digit percentage increase from Sunday Ticket's 2014 price.

**The NFL's Monopoly Power**

53.     As noted previously, the relevant geographic market is the United States, and the relevant product market is out-of-market broadcasts of professional football games.

54.     These out-of-market games appeal to fans of non-local teams. Bars and restaurants cater to these fans by subscribing to Sunday Ticket, and showing the games on

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

multiple televisions. They also appeal to fantasy football fans, and people who simply enjoy watching professional football.

55.    It is highly unlikely that new entities will emerge to challenge the NFL's monopoly power over the business of professional football.

56.    The last successful entity to challenge the NFL's dominance was the AFL. The AFL operated as a separate league during the 1960s, before being folded into the NFL as the American Football Conference.

57.    In 1982, the United States Football League formed to play professional football during the spring and summer. The USFL featured high-caliber teams composed of numerous stars, such as Jim Kelly, Steve Young, and Herschel Walker. It also had well-heeled owners such as Donald Trump, who owned the New Jersey Generals. Despite these advantages, when the USFL moved to a fall football schedule to compete with the NFL, it was crushed, and disbanded. The USFL sued the NFL for monopolization and won a jury verdict for a nominal amount. *USFL v. NFL*, 842 F.2d 1335 (2d Cir. 1988).

58.    In 2001, wrestling impresario Vince McMahon joined with NBC to launch the XFL to play spring and summer football games. Despite national broadcast rights, the league was a multi-million dollar failure, and folded after a single season.

59.    The Arena Football League emerged in 1987, and with the exception of 2009, has featured a game facially similar to the NFL, but with a relatively lower-caliber set of players and numerous rule modifications designed to create a fast-paced, high scoring affair. The Arena Football League plays its games during the spring and summer, and has only a marginal fan following.

60.    There exist other, smaller professional leagues that play football. The Legends Football League, formally known as the Lingerie Football League, features seven-on-seven

football games with female players. The Indoor Football League is a semi-professional league featuring indoor games played in smaller market cities, such as Wichita Falls, Texas and Grand Isle, Nebraska.

61.    Experience dictates that it is virtually impossible that a new league will develop to compete away the NFL's monopoly power.

**Exclusivity is Not Warranted**

62.    The NFL Teams' exclusive deal with DirecTV has no purpose beyond charging customers supra-competitive profits. Sunday Ticket merely operates as a conduit through which games, which are already being broadcast to local in-market consumers, are provided to out-of-market consumers. With minimal exceptions, such as adding its logo to a standing page before the broadcast begins, DirecTV adds nothing to the broadcast itself; there is no DirecTV announcer and no DirecTV originated content. DirecTV does not even air its own advertisements. Rather, the advertisements are just taken directly from the local feed.

63.    DirecTV once tried to gain exclusive access to MLB's out-of-market sports package. This effort provides some demonstration of the value exclusive out-of-market sports packages have for DirecTV.

64.    In 2007, DirecTV agreed to pay MLB $700 million over 7 years for exclusive carrying rights for Extra Innings, MLB's out-of-market sports package. At the time, Extra Innings was carried by many MVPDs, including DirecTV's satellite competitor Dish Network, and a three-MVPD consortium known as InDemand. InDemand offered MLB $490 million over 7 years for non-exclusive access to Extra Innings, an offer MLB rejected in favor of DirecTV.

65.    Under Congressional pressure, DirecTV and MLB did not go ahead with their transaction. Nevertheless, the price DirecTV was willing to pay for exclusive access ($700

million), compared with the price the InDemand consortium was willing to pay ($490 million) shows that exclusive access to out-of-market games carries a premium of approximately 43%.

66.     But for the NFL Teams' collusion with DirecTV, Sunday Ticket would be carried on a slew of MVPDs. In Canada and Mexico, numerous MVPDs compete with each other in the marketing and sale of Sunday Ticket. In the United States, various MVPDs have exhibited an interest in carrying Sunday Ticket, and most MVPDs carry out-of-market platforms for the other major sports leagues.

## PLAINTIFFS AND THE PUTATIVE CLASS HAVE SUFFERED ANTITRUST INJURY

67.     Plaintiffs and the putative class have suffered the type of injury the antitrust laws were designed to prevent.

68.     First, Plaintiffs and the putative class are required to take all out-of-market football games broadcast on a Sunday afternoon, or none of them.

69.     Second, Plaintiffs and the putative class are also forced to subscribe to DirecTV if they want access to NFL Sunday Ticket. There currently exists no way in which commercial subscribers, such as Plaintiffs and the putative class, can access Sunday Ticket absent also having a subscription to DirecTV.

70.     Third, Plaintiffs and the putative class are charged supra-competitive prices for NFL Sunday Ticket that they would not be charged absent the conduct described herein.

## THE SPORTS BROADCASTING ACT DOES NOT IMMUNIZE DEFENDANTS'CONDUCT

71.     The SBA allows professional football, basketball, hockey, and baseball to jointly market their pooled rights for sports telecasts, enabling teams to share revenue and jointly bargain together.

72.     The relevant language of the Sports Broadcasting Act reads:

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

The antitrust laws, as defined in section 1 of the Act of October 15, 1914, as amended (38 Stat. 730) [15 U.S.C. § 12], or in the Federal Trade Commission Act, as amended (38 Stat. 717) [15 U.S.C § 41 et seq.], shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs….

15 U.S.C. § 1291.

73.     The legislative history of the SBA makes clear that it is only to apply to the "free telecasting of professional sports, and does not cover pay T.V." *Telecasting of Professional Sports Contests: Hearings on H.R. 8757 Before the Subcomm. On Antitrust of the House Comm. Of the Judiciary.* 87th Cong. 36 (1961).

74.     A subsequent bill, proposed in 1981, sought to extend the SBA to cover cable and pay T.V., but subsequently failed. *H.R. 823* 97th Cong. (1981).

75.     In *Chicago Pro. Sports Ltd. Partnership v. NBA*, 808 F.Supp 646, 649-50 (N.D. Ill. 1992), the District Court of the Northern District of Illinois held that the Sports Broadcasting Act applied only to free commercial television

76.     Again, in *Shaw v. Dallas Cowboys Football* Club, 172 F.3d 299 (3d Cir. 1999), the Third Circuit (analyzing the NFL's sale of broadcast rights to DirecTV held that the SBA applied only to the broadcast of games on free broadcast television, and that the pooled sales of broadcast rights to individual subscribers is not sponsored television.

77.     In *Lauman v. NHL*, 907 F.Supp.2d 465 (S.D.N.Y. 2012), this court held that "'[s]ponsored telecasting' under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks." *Id.* at 489 n. 141 (quoting *Kingray v. NBA, Inc.*, 188 F.Supp.2sd 1177, 1183 (S.D. Cal. 2002)).

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

78.     Both the Senate Subcommittee on Antitrust and the Federal Trade Commission, have concluded that the term "sponsored telecasting" applies only to the sale of broadcast rights to free commercial television. *See Shaw*, fn. 12.

**COUNT ONE**
**VIOLATION OF SECTION ONE OF THE SHERMAN ACT**
**(Per Se Violation)**

79.     Plaintiffs repeat and re-allege each and every allegation above as though fully set forth herein.

80.     Beginning at least in the early 1990s, and continuing through to the present, the NFL teams, in connivance with DirecTV, have entered into a continuing agreement, combination, or conspiracy in restraint of trade, with the purpose, intent and effect of restraining trade and commerce in the distribution of out-of-market NFL games, in violation of Section 1 of the Sherman Act.

81.     This continuing agreement, combination, or conspiracy consists of substantial horizontal elements, including an agreement between the NFL Teams, to limit competition between themselves, who would otherwise be competitors in the live-game distribution market. Thus, the conspiracy has substantial horizontal elements.

82.     This continuing agreement, combination, or conspiracy has resulted in an agreement, between the NFL Teams on the one hand, and DirecTV on the other, that Sunday Ticket will be exclusively broadcast by DirecTV, to the detriment of other MVPDs and consumers.

83.     Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act. Thus, no allegations with respect to the relevant product market, geographic market, or market power are required. To the extent such allegations may otherwise be necessary, the relevant product

market for purposes of this action is out-of-market NFL games. The relevant geographic market is the United States. The NFL teams control 100% of this market.

84.     As a direct result of the Defendants' unlawful conduct, prices for out-of-market NFL games were raised, fixed, maintained, and stabilized in the United States.

85.     As a direct result of the Defendants' unlawful conduct, Plaintiffs and the other members of the putative class have been injured in their business and property in that they paid more to view these games than they otherwise would have paid in the absence of such conduct.

86.     With respect to their claim under the Sherman Act, Plaintiffs and the members of the putative class seek and are entitled to treble damages, attorneys' fees and costs.

## COUNT TWO
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (Rule of Reason)

87.     Plaintiffs repeat and re-allege each and every allegation above as though fully set forth herein.

88.     Beginning at least in the early 1990s, and continuing through to the present, the NFL teams, in connivance with DirecTV, have entered into a continuing agreement, combination, or conspiracy in restraint of trade, with the purpose, intent and effect of restraining trade and commerce in the distribution of out-of-market NFL games, in violation of Section 1 of the Sherman Act.

89.     This continuing agreement, combination, or conspiracy consists of substantial horizontal elements, including an agreement between the NFL Teams, to limit competition between themselves, who would otherwise be competitors in the live-game distribution market.

90.     This continuing agreement, combination, or conspiracy has resulted in an agreement, between the NFL Teams on the one hand, and DirecTV on the other, that Sunday

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1  Ticket will be exclusively broadcast by DirecTV, to the detriment of other MVPDs and

2  consumers.

3        91.    The continuing agreement, combination or conspiracy has caused injury and

4  anticompetitive effects in the relevant geographic market, which is the United States, and in the

5  relevant product markets, which is the market for live distribution of NFL games to commercial

6

7  subscribers.

8        92.    DirecTV has market power in the MVPD market, and specifically in the market

9  for commercial consumers.  The NFL, in turn, has monopoly power with regard to the creation,

10 licensing and distribution of NFL games.  Through their exclusive arrangement, the NFL has

11 enhanced DirecTV's market power in the MVPD market.

12
        93.    As a direct result of the Defendants' unlawful conduct, prices for out-of-market
13
   NFL games were raised, fixed, maintained, and stabilized in the United States, affecting
14
   interstate commerce through their conspiracy.
15

16       94.    As a direct result of the Defendants' unlawful conduct, Plaintiffs and the other

17 members of the putative class have been injured in their business and property in that they paid

18 more to view these games than they otherwise would have paid in the absence of such conduct.

19 Defendants' conduct directly and proximately caused antitrust injury.
20
        95.    With respect to their claim under the Sherman Act, Plaintiffs and the members of
21
   the putative class seek and are entitled to treble damages, attorneys' fees and costs, as well as
22
23 injunctive relief.

24                              **COUNT THREE**
                 **VIOLATION OF SECTION TWO OF THE SHERMAN ACT**
25

26       96.    Plaintiffs repeat and re-allege each and every allegation above as though fully set

27 forth herein.

28

97.     Defendants, as described above, possess monopoly power over the creation, licensing, and distribution of out-of-market games, and have used that power for the purposes of, and with the effect of, unreasonably excluding and/or limiting competition, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), by limiting Sunday Ticket's distribution only to DirecTV.

98.     Limiting distribution of Sunday Ticket only to DirecTV goes far beyond a "legitimate business activity" and constitutes an abuse of Defendants' dominant market provision.

99.     The relevant geographic market is the United States. The relevant product market is the market for broadcasting the live distribution of out-of-market NFL games.

100.    NFL Teams have allowed DirecTV to illegally acquire and maintain its monopoly power in the relevant product market and DirecTV has continued to maintain its willfully acquired monopoly power all in violation Section 2 of the Sherman Act. Absent injunctive relief by this Court, this conduct will continue.

101.    As describe above, Plaintiffs and the putative class have suffered antitrust injury and damages, and will continue absent injunctive relief by this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, and for the foregoing reasons, Plaintiffs pray this Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

a.      This action may proceed as a class action pursuant to Rule 23(b)(3), with Plaintiffs designated as the Class representatives, and their chosen counsel designated Class Counsel;

b.      That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

d.      That Plaintiffs and the members of the Class recover pre-judgment and post-judgment interest as permitted by law;

e.      That the Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined from maintaining the conspiracy or agreement described herein.

f.      That Plaintiffs and the members of the Class recover their costs of the suit, including attorneys' fees and expert fees, as provided by law; and

g.      Such other and further relief as this court deems just and proper under the circumstances.

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Dated: September 1, 2015

MORGAN & MORGAN

By: /s/ Peter Safirstein
    Peter Safirstein
    Roger A. Sachar Jr.
    28 West 44th Street
    Suite 2001
    New York, NY  10036
    Telephone: (212) 564-1637
    Facsimile: (212) 564-1656
    PSafirstein@MorganSecuritiesLaw.com
    RSachar@MorganSecuritiesLaw.com

    BLOCK & LEVITON LLP
    LESLEY E. WEAVER
    (State Bar No. 191305)
    520 3rd Street, Suite 108
    Oakland, CA 94607
    Telephone: (415) 968-8999
    Facsimile:  (617) 507-6020
    lweaver@blockesq.com

CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF